SPRAGUE (STONE v.). See Case No. 13,-487

SPRAGUE (TOLAND v.). See Case No. 14,-076.

## Case No. 13,255.

### SPRAGUE v. WEST.

[Abb. Adm. 548;[1] 8 N. Y. Leg. Obs. 241; 3 Am. Law J. (N. S.) 202.]

District Court, S. D. New York. July 26, 1849.

SHIPPING—UNLADING—DELIVERY—DEMURRAGE—HOW COMPUTED.

1. The owner of the vessel takes the risk of working weather during the time required for the unlading of the cargo.
[Cited in The Mary E. Taber, Case No. 9,-209; Bertellote v. Part of Cargo of Brimstone, 3 Fed. 662.]

2. The consignee takes the risk of roads and means of transportation from the dock; and is bound to take the cargo as delivered to him at the vessel's side, and to remove it as fast as the vessel can be reasonably discharged.
[Cited in The Hyperion's Cargo, Case No. 6,987; Unnevehr v. The Hindoo, 1 Fed. 629: Bertellote v. Part of Cargo of Brimstone. 3 Fed. 662; Gronstadt v. Witthoff, 15 Fed. 271.]

3. It seems that the consignee cannot be made liable for demurrage where there is in the charter party or bill of lading no express agreement or stipulation in respect to it, or in respect to lay days.
[Cited in The Hyperion's Cargo, Case No. 6,987.]

4. The freighter is liable to the vessel for any unnecessary detention in loading or unloading, although no express contract is made on the subject; and compensation for such detention may be recovered under the name of demurrage.
[Cited in Donaldson v. McDowell, Case No. 3,985; Two Hundred and Seventy-Five Tons of Mineral Phosphate, 9 Fed. 211; Blowers v. One Wire Rope Cable, 19 Fed. 449; Hawgood v. One Thousand Three Hundred and Ten Tons of Coal, 21 Fed. 685; The William Marshall, 29 Fed. 329; Neilsen v. Jesup, 30 Fed. 139; Gates v. Ryan, 37 Fed. 155; Melloy v. Lehigh & W. Coal Co., Id. 378.]
[Cited in Brett v. Van Praag, 157 Mass. 143, 31 N. E. 763; Falkenburg v. Clark, 11 R. I. 283. Cited in brief in Hall v. Barker, 64 Me. 341.]

5. Upon what principles demurrage for the unnecessary detention of a vessel while unloading should be computed.
[Cited in Sheppard v. Philadelphia Butchers' Ice Co., Case No. 12,757.]

This was a libel in personam by James Sprague and others, owners of the schooner John R. Watson, against J. Selby West, to recover damages for the detention of a vessel.

The libel in the cause was as follows:

"To the Honorable Samuel R. Betts, &c.

"The libel of James Sprague, Charles Keen, David Crowell, and Daniel Butler, owners of the schooner John R. Watson, against J. Selby West, of said district. coal dealer, in a cause of contract, civil and maritime, alleges as follows:

"First. That in the month of December last, the said schooner lying at Philadelphia and destined on a voyage to New York, Richard Jones & Co. shipped on board the said schooner one hundred and ninety-four tons of coal,

[1] [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]

or thereabouts, to be therein carried from Philadelphia to New York, and there delivered in like good order and condition (the dangers of the sea only excepted), to J. Selby West, or his assigns, to whom the same belonged, he or they paying freight for the same, at the rate of ninety cents per ton; and accordingly, the master of said schooner at Philadelphia, on the fifteenth day of December last, signed the usual bill of lading, a copy of which is hereto annexed.

"Second. That shortly afterwards the said schooner set sail from Philadelphia to New York with the said coal on board, and there safely arrived on or about the nineteenth day of December; and on the next day James Sprague, the master of said vessel, caused a written notice to be served upon J. Selby West, the consignee and owner of the coal, as follows:

"'New York, December 20, 1848. Sir: You will please take notice, that the schooner John R. Watson, under my command, and loaded with coal consigned to you, was ready to discharge cargo this morning, of which fact you have been duly notified. And you will further take notice, that demurrage will be demanded for every day she is detained. Yours, &c. James Sprague. To J. Selby West, Esq.'

"Third. That the said West accepted the said cargo, and commenced to receive the said coal, but refused to take it save in very small quantities and at irregular times, capriciously and vexatiously; and when urged and requested to take the same more expeditiously, replied, that he would take it when it suited him, and no faster, and would keep the schooner as long as he wanted to, for the captain could not help himself; and in accordance with such threat, he detained the said schooner until the fourth day of January, instant, on which day fifty tons of coal were still on board and were taken out by him and his agents, and the schooner completely discharged.

"Fourth. That during the whole time the said schooner was so detained, she was obliged to lie at the foot of Forty-Second street, in the North river, that being the place designated by the bill of lading, in danger of being frozen up and compelled to winter here; and her whole crew were detained at the expense of the vessel, and two extra men and a horse were kept constantly waiting on the dock during very severe and cold weather, ready to deliver the coal whenever the said West should take it away. And the said West was often notified by the master of the said schooner that said master was constantly ready to deliver said coal, and that the expense and damage of such detention would be demanded of him.

"Fifth. That the usual and sufficient time to discharge such a cargo of coal is four days, and these libellants claim to be entitled to have of the said West the damages sustained by them by reason of the unjust detention of said vessel beyond that time, which they allege amounts to the sum of two hundred and thirty-one dollars and upwards.

"Sixth. That all and singular the premises are true, and within the admiralty and maritime jurisdiction of the United States, and of this honorable court.

"Wherefore these libellants pray that a warrant of arrest in due form of law, according to the course of this honorable court, in admiralty and maritime cases, may issue against the said J. Selby West, and that he may be compelled to answer upon oath all and singular the matters aforesaid, and that this honorable court would be pleased to decree the payment of the damages aforesaid, with costs, and that he may have such other relief as in law and justice he may be entitled to recover.          James Sprague."

On the hearing of the cause, it appeared on behalf of the libellants, that the John R. Watson took in at Philadelphia a cargo of coal belonging to respondent and consigned to him at New York. There was no stipulation in the bill of lading (which was in the usual form) relative to demurrage, detention, or lay days. The vessel arrived at New York, and on December 20, 1848, as stated in the libel, and again on the 21st, the respondent was notified in writing that she was ready to discharge. Three working days were enough to discharge the cargo, and the master and crew were at all times ready, but the vessel was not in fact discharged till January 4, 1849; for the reason that the respondent did not send carts enough to remove the coal as fast as it could be discharged.

The respondent denied the jurisdiction of the court; denied his liability for demurrage in the absence of an express contract; and justified his delay in receiving the cargo, on the ground of bad weather, bad streets, and the distance of the place where the vessel lay from his coal yard.

Other facts are stated in the opinion.

E. C. Benedict, for libellant.
H. Brewster, for respondent.

BETTS, District Judge. A cargo of one hundred and ninety-four tons of coal, belonging to the defendant, was shipped at Philadelphia on board the libellant's vessel. The master signed a bill of lading to deliver the same to the respondent at Forty-Second street, New York, for ninety cents per ton, freight.

The vessel arrived at the place designated on the 19th of December last, and the respondent, not being able to receive the coal at that place, ordered the master to moor at Twenty-Ninth street and unload there. The vessel took her berth at that place the same day, and the next morning was ready to commence discharging, of which a verbal notice, and afterwards a written one, was given the respondent, with further notice that demurrage would be claimed of him for any

unnecessary detention of the vessel. The written notice was sent the 21st. The respondent failed supplying the carts necessary to remove the coal, and the vessel was not fully discharged of her cargo until the 4th of January following.

Although the weather was at times stormy and the roads bad, yet, on the proofs, neither of these circumstances prevented unlading the vessel and removing the cargo at once; and it is well established by the proofs, that with ordinary diligence the cargo could have been delivered in three days. The libel alleges that four days was amply sufficient.

The libellants undoubtedly took the hazard of working weather. The evidence to that point is satisfactory, that coal was constantly unladen and carted from North river piers during those days; and a vessel of the burden of this one, coming to her dock the same day, and having one hundred and fifty tons on board, was completely discharged and sailed again within three days. The state of the weather, therefore, did not prevent the work being done.

The respondent was bound to take the risk of roads and means of transportation from the dock. He was to take the coal as delivered him at the vessel's side, and to supply means of removing it as fast as the vessel could be reasonably discharged. This is the general rule of maritime law (The Grafton [Case No. 5,656] [2] November, 1844), and the evidence in the present case shows it the established custom of the coal trade at this port.

The respondent had then the 20th, 21st, 22d, and 23d days of December, when the weather was suitable and the vessel in readiness to discharge, which could have afforded him time to take away the whole cargo. But, giving him four full days, including the 21st, and deducting Sunday, the 24th, and Christmas, the vessel should have been discharged the 26th, and her detention beyond that period was unnecessary, and caused by the fault and delinquency of the respondent.

The position is taken by the respondent, in objection to the claim of demurrage, that it is only recoverable on an express stipulation to pay it, and that the bill of lading being an ordinary one in this case, the libellants have no remedy against the consignees, beyond the freight stipulated to be paid.

It is not to be denied that the practice would be more prudent, and liable to cause less disturbance to navigation and trade, if the parties, as suggested in some of the English cases, would note in the bill of lading or charter party, the time allowed for lading or unlading the vessel at her ports of affreightment or discharge, and also the consequences of overrunning that period. And probably, upon the more modern authorities (Abb. Shipp. 304; 3 Johns. 342), a consignee cannot be made liable on an implied obligation for demurrage, no express agreement or stipulation being made in the charter party or bill of lading, in respect to it or to lay days. But the doctrine is different in regard to the freighter. He is held liable to the vessel for any unnecessary detention in loading or unloading, although no express contract is made on the subject. Holt, Shipp. pt. 3, c. 1, § 25. To the same effect are the ancient ordinances, and the rules of other maritime countries. 1 Valin, 649, 650. And the English courts, though hesitating somewhat at terming the compensation demurrage, hold that the freighter or consignee who improperly detains a vessel, is liable to a special action on the case for the damage resulting from such detention. 9 Car. & P. 709; [11 Mees. & W. 498].[3] Courts of admiralty act upon the rights arising out of maritime transactions, without regard to modes or names of actions, and independent of all points of form. The suggestion that demurrage can be claimed upon the footing of express contract alone, is undoubtedly giving too narrow an effect to the term. Every improper detention of a vessel may be considered a demurrage, and compensation in that name be obtained for it. 2 Hagg. Adm. 317; [The Apollon] 9 Wheat. [22 U. S.] 362; Hooper v. 51 Cases of Brandy [Case No. 6,674]. Demurrage is only an extended freight or reward to the vessel in compensation of the earnings she is improperly caused to lose. Holt, Shipp. pt. 3, c. 1.

The jurisdiction of the court over sea freights and demurrage resulting from such voyages, it appears to me, is indisputable, and the branch of the defence resting on exceptions to the jurisdiction is overruled.

I shall accordingly decree against the respondent as owner of the cargo, damages by way of demurrage for the unnecessary detention of the vessel from the 26th of December to the 4th of January.

Various methods of computing these damages are referred to and adopted by the courts. The Anna Catharina, 6 C. Rob. Adm. 10; Holt, Shipp. 338, § 28; Abb. Shipp. 304; Hooper v. 51 Cases of Brandy [supra]. See, also, the case of The Rhode Island [Cases Nos. 11,740a, 11,744] note 1. The usual earnings of the vessel in her regular course of employ, is, perhaps, a method not less entitled to adoption than others frequently approved and acted upon. It is in proof that upon average voyages of from fifteen to eighteen days, this vessel was earning at that period about $10 per day. No doubt that is a low valuation of her worth to the owners, but it may be as safe a criterion to guide the judgment of the court in estimating the loss they incurred by being deprived of her services that period, as the opinion of witnesses to her charter value in herself by the month or day. It belongs to the libellants to give satisfactory proof to this point, and to supply

---

[2] This case was afterwards affirmed on appeal to the circuit court.

[3] [From 8 N. Y. Leg. Obs. 241.]

a method of computation by which the court can ascertain the damages with reasonable precision.

Assuming that as the basis of computation, the detention of the vessel would deprive her of earning, as she was then fitted out, manned, and provisioned, from ten to twelve dollars per day. I shall allow for the nine days' detention one hundred dollars.

Decree accordingly.

[This cause was carried to the circuit court by appeal. The appeal, however, was abandoned, and the cause was settled without an argument.] [4]